JOSEPH A. FOGG *vs.* INHABITANTS OF NAHANT.
FREDERICK MAY *vs.* SAME.

If a horse which a traveller is driving on a highway throws his tail over the rein, and thereby frees himself for a considerable distance from control, so that the driver cannot prevent coming upon a defect in the way, upon which he could have prevented coming had he retained control, the town is not liable for an injury so caused.

TWO ACTIONS OF TORT, the first for personal injuries sustained by Fogg, and the second for injury to a carriage owned by May, alleged to have been caused by a defect in a highway which the defendants were bound to keep in repair.

At the trial of the actions together in the superior court, before *Reed,* J., there was evidence that the highway descended from the top of a hill some three hundred feet to a gap between a wall and a ledge of rock, and still descending made a sharp turn to the right after passing the gap; that outside of the way or track on the left was a wash or gully; and that the accident happened between fifty and a hundred feet below the gap.

Frederick W. G. May testified that at the time of the accident he was driving the carriage of the plaintiff May, and a pair of horses; that " the nigh horse had a habit of throwing his tail over the rein, and when he did so would start up a little, quicken his pace, and then slack off and the rein would be relieved; " that about a hundred feet before reaching the top of the hill the horse threw his tail over the rein and started up; and further as follows : " I stooped down and took hold of the tail with one hand, to get it off the rein. In doing so I bore on the dasher so as to bend it down, and thereupon gave it up, and resumed my seat before we got to the top of the hill, and held firmly on the reins. The nigh horse went at what I call a 'lope,' not a gallop; the other horse never broke his trot. The horses bore off to the left a little more than desirable. I kept them near the ledge side as I could. When we got to the gap, the left wheel went down in the gutter. We went a little further, when we went over and were thrown out. My belief is, that immediately after striking the gutter the carriage went on the two left wheels. Fogg held

my little boy between his knees; just as we reached the gap, he took hold of and bore upon the right rein with his left hand. When we started up the ascent I should think we were going some eight or nine miles an hour, and we went down the hill at that rate, perhaps a little faster; it was nothing like a run, not so fast as I have driven these horses. We struck the gutter very soon after leaving the gap, close up to it; all was over within one hundred feet from it. I do not think that I could have stopped the horses at once; but we did control them very much, we kept them in the track. The road bore sharp to the right. It was not easy to stop a pair of horses on a hill so steep as that. I did not try to stop them, but to keep them in the track. I could have stopped them if the rein had not been under the tail. I held on the two reins steadily, but I did not move the rein under the tail at all. I could have stopped them in going one hundred feet on an ordinary road, but not there on that road."

Fogg testified that he was the plaintiff May's coachman, and was in the carriage at the time of the accident, although, on account of his right hand being lame, he was not driving; that at the top of the hill "the nigh horse threw his tail over the rein and started up a little as he would if urged. Mr. May reached over to pull it off, bent the dasher, and gave it up; the horses started down the hill; the nigh one cantered, as he would occasionally; the other did not break his trot. I took hold of the right rein, and held on it. I did not pull round, I kept them back. When at the gap, where the gully or wash was, the carriage ran into the gutter, and swayed off to the side of the road. As soon as we struck off at the gully, at the corner by the gap, we went over where the road falls to the left, and upset. The horses were kept back by my hold. I should say we were going down the hill at six or seven miles an hour, not more. There was no trouble till we got down to the gap and into the gully. We kept the horses very nearly in the track. We did not stop them going down the hill, because there was no need of doing so. We did not want to; we wanted to go on our way. I do not think we could have stopped them at once, on a hill as steep as that, with the load we had in; but they were kept back by my

hold. We could not have stopped them as we were, with the tail over the rein, on that hill. I had been on the road daily during the summer; and never found any difficulty in coming down before, by driving slowly. I generally let the horse take his own course, when he threw his tail over the rein; he would usually slack off his tail and relieve the rein himself."

The defendants offered no evidence, but contended "that, as matter of law, there was no evidence to go to the jury to show that the horses were, at the time of the accident, under any efficient control or guidance of their driver, but that, by the plaintiffs' own showing, they were, and for a considerable time had been, wholly unmanageable and out of his control;" and asked the judge so to rule. He did so rule, and directed the jury to return verdicts for the defendants, which was done; and the cases were reported for the revision of this court. If the rulings were right, then judgments were to be entered for the defendants on the verdicts; but if otherwise, then the verdicts to be set aside and new trials ordered.

*G. W. Phillips*, for the plaintiffs.

*W. C. Endicott*, for the defendants.

MORTON, J. When these cases were before the court at a former term, it was decided, after mature and careful consideration, that the facts, as there reported, brought them within the rule laid down in *Davis* v. *Dudley*, 4 Allen, 557, and *Titus* v. *Northbridge*, 97 Mass. 258. See *Fogg* v. *Nahant*, 98 Mass. 578. We are unable to see that the report of the evidence at the second trial presents the cases in any different aspect. It was substantially the same as at the first trial, and shows that at the time of the accident, and for some time before, the horses were beyond the control of their driver, and that this fact contributed to the accident. The ruling of the presiding judge directing verdicts for the defendants was therefore correct.

*Judgments on the verdicts.*