COMMONWEALTH *vs.* BOSTON AND LOWELL RAILROAD COR-
PORATION.

Essex. Nov. 6, 12. — Dec. 9, 1878. ENDICOTT and LORD, JJ., absent.

The St. of 1874, *c.* 372, § 163, imposing a penalty where "by reason of the negli-
gence or carelessness of a railroad corporation, or of the unfitness or gross
negligence or carelessness of its servants or agents while engaged in its busi-
ness," a life is lost, applies to a case where such a corporation is using a railroad
track reasonably incident to the business in which the corporation is lawfully
engaged, although the track is not within the chartered limits of the corpora-
tion, or of a road then under its control, but is a private track which it is using
by the mere sufferance and license of its owner.

At the trial of an indictment, under the St. of 1874, *c.* 372, § 163, against a rail-
road corporation, for killing four persons not passengers, there was evidence
that three of the persons had been on an excursion in a steamboat, which, on
its return at night, stopped at a pier two thousand feet long, the outer part of
which was one hundred feet wide, and the part towards the shore, for the dis-
tance of thirteen hundred feet, was twenty-six feet wide and built on piles;
that there were two railroad tracks on the pier, the rail on the east side being
so near a box, three feet high, covering a water-pipe on that side, that when a
train of cars was on the east track there was only a space of from five to seven
inches between the box and the cars; that the three persons were seen to leave
the boat and to go with a crowd of persons towards the shore end of the pier;
that they were again seen with the fourth person, who was the son of two of
them and who had not been on the excursion, as a train of cars, which came
upon the pier with great rapidity and without due warning, was rolling them
round and round between the side of the cars and the box, and that their bodies
were soon after found under the cars; that some persons escaped by getting on
to the box, and one by hanging on the outside of the pier. *Held,* that there
was sufficient evidence to warrant the jury in finding that all the persons killed
were in the exercise of due care at the time of the accident. .

INDICTMENT on the St. of 1874, *c.* 372, § 163, alleging, in
separate counts, that on August 29, 1877, Joseph Swasey, Lydia
A. Swasey, Wilbur B. Swasey and Rachel B. Gifford, not being
passengers, while in the exercise of due diligence, were killed by
the defendant corporation, through the gross negligence and
carelessness of its servants and agents, while engaged in its
business, upon the pier of the Philadelphia and Reading Coal
and Iron Company, at Salem. At the trial in the Superior
Court, before *Bacon,* J., the following facts appeared:

The pier where the accident happened was not within the
location of any railroad corporation, but the tracks were laid by
the Eastern Railroad Company, under a license from the Phila-

delphia and Reading Coal and Iron Company. The pier extends from Derby Street, southerly into the harbor of Salem, about two thousand feet, of which about thirteen hundred feet, being the part towards Derby Street, is built upon piles, and about seven hundred feet in length of the southern end is solid, being built of stones and earth. The width of the part on piles is twenty-six feet, and the width of the filled part is one hundred and three feet. About two hundred feet from Derby Street, on the pier, is a gate, which is in two parts and opens against a water box on the east side of the pier, and against the rail on the western side; the eastern half of the gate is eleven feet three inches long. There are two tracks from Derby Street upon the pier: the eastern track has the rails even with the planking of the wharf, and the rails on the western track are laid upon the surface of the planking. The width of the pier, inside of the timbers on the side of it, is twenty-three feet five inches; on the eastern side of the pier is a box that covers a pipe that carries water from Derby Street, down to the head of the pier; this box is fourteen and one half inches wide, and one foot deep, and the top of it, at the gate, is three feet seven inches above the planking. The east rail on the east track is three feet and one inch from the timber under the box on the eastern side of the wharf. The width of the tracks is four feet eight and a half inches, and the distance between the two tracks seven feet, and, when there is a train of cars on each track, the distance between the two trains is about three feet. The distance from the side of the car to the water box is six and one half inches, and, at the gate, five and one quarter inches. There was a nut about three inches from the bottom of the car, on the side of the car that caused the accident, that extended out from the side of the car an inch and a half, and a staple about a foot long extended out from under the side of the car, from the bottom of the car, about two inches and a half from the side of the car. The car is nine feet seven inches wide. From the bottom of the car body to the planking the distance is three feet five inches, and from the lower step sixteen and one half inches to the planking.

On August 29, 1877, the steamer Plymouth Rock, for which an excursion had been arranged by her agent, sailed from the pier

to the Isles of Shoals in the forenoon and returned to the pier at about seven o'clock in the evening of the same day. Tickets for the excursion were sold by the ticket-masters of the defendant at Lowell and Lawrence, and a special train was run which united cars from Lowell and Lawrence, and the same were taken in the morning, by the persons in charge of the train, upon the pier, and the passengers discharged. The engine and cars were manned by servants of the defendant corporation.

The Plymouth Rock took on the excursion from the head of the pier, in the morning, about twenty-five hundred passengers, and returned with the same number in the evening. There were only about five hundred and twenty of the passengers on the steamer that were passengers in the train, the rest of the passengers being from Salem and vicinity. The train that went to the pier to take the Lowell and Lawrence passengers consisted of twelve cars, and arrived at the pier soon after eight o'clock in the evening.

The government offered evidence tending to prove, and it was admitted to be true, that the conductors of the train, and such other persons as had charge and control of it, were the agents and servants of the defendant, engaged at the time in its business; and that this train was then engaged in the business of carrying passengers for hire, and the profits of such carrying were for the benefit of the defendant, and were received by it, although it received no additional recompense for the moving of the train on to the pier.

When the train stopped upon the pier in the evening, the engine and five cars and a part of the sixth car had passed the gate, and, when it stopped, Joseph Swasey was found on the east rail of the east track under the rear truck of the fifth car, dead, a few feet down the pier from the gate, and Rachel B. Gifford, Lydia A. Swasey and Wilbur B. Swasey were found at the gate and a few feet from the northern end of it. Mrs. Swasey was dead, and Wilbur B. Swasey and Rachel B. Gifford were still living. Rachel B. Gifford died the same night, and Wilbur B. Swasey died the next morning. The physicians, who were called to examine them soon after the accident, testified that these persons were all injured in the same manner, and that the injuries were such as would be caused by the rolling of their bodies

between the car and the water box, and that the injuries were
such as must cause death.

There was evidence tending to prove that this train of cars
came upon the pier at about eight o'clock, at a speed of six miles
an hour, without any light upon the engine which could be seen
by the people in front of it; that the night was so dark that the
train could not be seen by a person who was looking intently
for it, and who, being upon the pier, was watching to see which
track it was coming upon, until it was within fifteen feet of him;
that no whistle was blown at any place at which the train could
have been seen from the pier, in the day-time; that no bell was
rung, and no lights were displayed upon or in the vicinity of the
train, and no warning given in any manner of its approach.
The defendant put in evidence contradicting the testimony in
behalf of the Commonwealth on these points.

There was also evidence tending to prove that, in addition to
the passengers arriving by the steamboat, a large number of
persons came down upon the pier to see her arrive or to meet
their friends; that during the whole time between the arrival of
the steamer and the occurrence of the accident, there were large
crowds of people upon the pier, and especially that the part of
the pier between the solid part and the gate was so crowded
with people as to impede locomotion; that a large number of
those who were waiting for the train, in which to go to Lawrence
and Lowell, were standing upon the pier; and that the switches
upon the pier also interfered with the travel of passengers.

Joseph Swasey, Lydia A., his wife, and Rachel B. Gifford, a
sister of Lydia A., went upon the excursion in the Plymouth
Rock, lived in Salem, and were not passengers in the cars. They
landed from the steamer Plymouth Rock among the last that
landed, not more than two or three hundred landing after them.
There was evidence that it took the passengers about an hour to
get off the steamboat.

One witness testified that he saw Joseph Swasey, his wife and
wife's sister, at the head of the coal pockets which are on the
solid part of the pier; that they passed up the pier, and he re-
mained a few minutes at the pockets after they passed up; that
he did not remain longer than fifteen minutes, and then passed
up the pier to Derby Street; that when going up the pier

towards Derby Street he did not see Mr. and Mrs. Swasey or Miss Gifford; that when he got on to Derby Street, about three or four rods from the railroad track, he saw the train going across Derby Street towards the pier; and that, after going up to East Webb Street, and assisting two ladies to take the horse-cars, he stopped some five minutes, and returned to Derby Street, where he heard of the accident.

Another witness testified that he went upon the pier between seven and eight o'clock of the evening of the accident; that he went down the pier towards the steamboat, remained awhile, and then proceeded up the pier towards Derby Street; that when on the way up, and within a few feet of the engine, he saw it coming and jumped to the right and threw himself upon the water box some ten feet to the north of the gate; that when he got on to the water box he saw a young man standing some four feet to the south of him and between him and the gate; that he saw two women standing near the young man a little farther to the south; that he cried out to the young man to get upon the box; that the car took the young man and the women and rolled them round and round, and they fell between the car and the gate; that when the car stopped the four persons killed were under the cars.

There was also evidence that one person as the engine approached got over the side of the pier, and held on by the railing, and others, including one woman, got on the water box.

No other witness testified to seeing either of the persons killed prior to or at the time of the accident; but Wilbur B. Swasey, who did not go upon the excursion, was seen at a place in Salem about a mile distant from the pier at about six o'clock the same evening.

It appeared in evidence that the pier was constructed by the Philadelphia and Reading Coal and Iron Company, and was owned by it, for the purpose of landing coal to be delivered to the railroads with which the tracks upon it were connected, and that the consent of the agent of the Coal and Iron Company was obtained by the agent of the steamboat for the boat to land at the pier, and for the train to run upon the same, as a matter of mere accommodation and without compensation, and that the defendant corporation had no right to run upon the pier except

by virtue of this license. There was no evidence that the directors, superintendent, or managers of the defendant corporation had any knowledge of the arrangement thus made, or of the use of the pier under such license.

The defendant asked the judge to rule that the defendant was not liable to an indictment under the St. of 1874, c. 372, § 163, where a death was caused upon a track not owned by or within the chartered limits of its road, nor within the chartered limits of any other railroad which was under its control, but was upon a private railroad track not constructed under any law of the Commonwealth, and upon which a train of cars belonging to the defendant was being drawn by the mere sufferance and license of the owner of said track, without any contract or compensation therefor, but simply by permission for this particular occasion; that the defendant would not be liable for the death of a person upon said track, if the only evidence of authority from the defendant to take its train upon the track was the fact that it was so taken by its conductors upon this occasion, for the accommodation of these excursion passengers, without any additional compensation to the defendant therefor, or any knowledge that the same was to be done by any other officer of the corporation.

The judge refused so to rule, but ruled that if a train, belonging to the defendant corporation and under the charge of its conductors, without any previous contract or direction therefor, and under the circumstances above described, was taken by the direction of the conductors upon the track for the accommodation of the persons carried and to be carried in said cars, although the corporation received no additional compensation for entering upon said track, the defendant would be liable under this statute for the killing of a person through the gross negligence and carelessness of its servants and agents.

At the close of the evidence, the defendant requested the judge to direct a verdict of not guilty, on the ground that there was no evidence tending to show that the persons killed, or either of them, were in the exercise of due diligence at the time of the accident. The judge declined so to do, and ruled that the question of due diligence was a question that should be submitted to the jury under all the circumstances of the case, and that the

question whether these persons were walking upon the track or went upon the pier under a license express or implied from the owners of the wharf, together with the nature and extent of the license, was a question for the jury under all the circumstances of the case.

The jury returned a verdict of guilty on all the counts; and the defendant alleged exceptions.

*J. H. George* (of New Hampshire) *& C. P. Thompson,* (*J. G. Abbott* with them,) for the defendant.

*S. B. Ives, Jr. & S. Lincoln, Jr.,* for the Commonwealth, were not called upon.

COLT, J.    The defendant corporation sold passenger tickets at Lowell and Lawrence, for an excursion to Salem, and thence by steamer to the Isles of Shoals. The special train upon which these passengers were carried was owned by the defendant, and was managed and controlled by its agents and servants. For the convenience of the passengers, and by the directions of those in charge, the train was run on and along the pier and wharf of a coal company, upon which were railroad tracks for the private use of the company, connected by a switch with the Salem and Lowell Railroad. The agent of the steamboat had obtained verbal permission from the coal company to receive and land the passengers there, and for the train to use the tracks upon the pier down to the boat for that purpose. There was no evidence that this use of the pier by the train on this occasion was known to the superior officers of the defendant corporation, but it was admitted that the persons in charge of the train were at the time engaged in the business of the railroad company, namely, the business of carrying passengers for hire, the profits of which were received by the company, although no additional recompense was had for running upon the wharf. The persons whose lives were lost by the alleged negligence of the corporation, or the gross negligence of its servants, were passing on foot over the pier, and were killed by the defendant's train as it came down in the evening to receive the passengers leaving the steamer on its arrival at the wharf.

The defendant is indicted under the St. of 1874, *c.* 372, § 163, which provides a penalty in cases where "by reason of the negligence or carelessness of a railroad corporation, or of the unfit

ness or gross negligence or carelessness of its servants or agents while engaged in its business, the life of any person being a passenger is lost; or the life of any person being in the exercise of due diligence, and not being a passenger, or in the employment of such corporation, is lost;" "provided that the corporation shall not be so liable for the loss of life by any person, while walking or being upon its road contrary to law."

The first question raised by the bill of exceptions is, whether the statute applies, when the loss of life occurs upon a railroad track not owned by the defendant, or within the chartered limits of its road, nor within the chartered limits of a road then under its control, but upon a private track upon which the train is run by the mere sufferance and license of the owner. It was ruled that, upon the facts admitted, the defendant might be liable under the statute for the killing of a person under such circumstances. This ruling was right. The defendant is liable if the death is caused by the gross negligence and carelessness of its servants, while engaged in its business. If the construction contended for by the defendant is the true construction, and the words " while engaged in its business " are held to limit the liability to cases of negligence arising directly in the business of transporting passengers and freight upon its own road, or upon a road which it lawfully uses, still the case comes fairly within its provisions. It is apparent that the use of this track was reasonably incident to the business in which the corporation was lawfully engaged. The track was constructed for the purpose of affording access from tide-water to the railroads terminating in Salem ; and it makes no difference that it was a private track, built and owned by another corporation, instead of a track built, as it well might have been, under the chartered powers of the railroad corporation. There was evidence to warrant a finding that the act of running the train on this track by the verbal license of its owner was authorized by the defendant corporation. At the time of the accident the defendant was in the actual use and occupation of it by the consent of the owner, and it must be treated, so far as this liability is concerned, as the defendant's track. It is settled that railroad corporations may incur responsibility, and subject themselves to liabilities, as incident to their business, for acts occurring beyond the limits of their own line. *Feital* v.

*Middlesex Railroad*, 109 Mass. 398. *McCluer* v. *Manchester &
Lawrence Railroad*, 13 Gray, 124.

It is further insisted, that there was no evidence which would
justify the jury in finding that the persons killed were in the
exercise of due care and diligence at the time of the accident.
The judge was requested so to rule, but ruled that the question
of due diligence, and the question whether these persons were
walking upon the track or were upon the pier, under a license
express or implied from the owners of the wharf, as well as the
nature and extent of the license, were questions for the jury,
under all the circumstances of the case.

The burden is upon the Commonwealth to show that the per-
sons killed were in the exercise of due care and diligence; but
this burden is sustained by proving facts and circumstances from
which it may be fairly inferred. If there is a sufficient disclosure
of facts, the mere absence of fault may be sufficient. In the
case at bar, the circumstances were such as tended to exclude
the idea of fault, and to indicate that these persons were in the
exercise of ordinary care. See *Crafts* v. *Boston*, 109 Mass. 519.

It appears that three of the persons killed were passengers
upon the excursion steamer, and the jury may well have inferred
that the other, who was not a passenger, was properly there, by
implied license, to take care of and conduct his father and mother
home. There was evidence tending to show, that they all pro-
ceeded together up the pier, with reasonable despatch, and with
nothing appearing unusual or disorderly in their conduct; it was
the only way to reach the street; the night was dark, and pro-
gress was impeded by crowds of other people passing along the
passageway in which the tracks were laid, or standing on the
pier waiting to take passage in the train. Of the twenty-five
hundred passengers on the steamer, two thousand from Salem
passed over these tracks from the wharf to the street, on their
way home. For a distance of thirteen hundred feet, where the
pier was built on piles, the width of the passageway, inside of
the timbers placed on each side, was about twenty-three feet.
Within this space two tracks were laid. The track on the east
side was planked up even with the rails, to accommodate ordinary
travel to and from the wharf, while the rails of the other track
were laid on the surface of the planking. It was upon the east

track that the accident happened. There was evidence that the train was running with great speed; that those who knew it was coming, and were watching for it, were unable to see it, until it had approached within fifteen feet. Many of the more active and less timid of those who saw it escaped the danger by throwing themselves over and hanging on by the side of the pier, or by springing to a perilous position, upon a box covering a water-pipe, that was constructed by its side. In all this there was some evidence that parties passing over that part of the passageway, which was apparently constructed for the use of those passing on foot to and from the wharf, and who were thus exposed to a sudden danger, from which escape was difficult, and who were there crushed between the train and the side of the pier, were in the exercise of ordinary care and diligence.

Those who, by express or implied license, were rightfully on the pier, were in a position similar to that of persons who, in a crowded station, pass along a way prepared for their use, and who have a right to rely on the usual and additional precautions which are taken by railroads to protect such persons from injury from an approaching train. A very different state of facts is thus presented from that upon which the case of *Hinckley* v. *Cape Cod Railroad*, 120 Mass. 257, was decided.

*Exceptions overruled.*